Peter CASTILLO, Appellant,

v.

STATE of Alaska, Appellee.

No. 4561.

Supreme Court of Alaska.

July 11, 1980.

Richard G. Lindsley, Juneau, and Deborah A. Paquette, Asst. Public Defenders, Brian Shortell, Public Defender, Anchorage, for appellant.

William H. Hawley, Asst. Atty. Gen., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

BURKE, Justice.

Peter Castillo was convicted of the attempted murder of Eli Sharclane in violation of AS 11.15.030.[1] In this appeal he challenges that conviction upon several grounds. We affirm.

Shortly after midnight, on September 25, 1977, Castillo was returning home from a dance when he encountered Sharclane on the Douglas side of the Juneau-Douglas Bridge. Castillo approached Sharclane to talk to him and, when Sharclane ignored Castillo's questions, Castillo struck him in the arm. A brief fight ensued; Sharclane then broke away and ran across the bridge towards Juneau with Castillo chasing him.

In a statement that Castillo now maintains was impermissibly elicited from him

---

1. Castillo was convicted under the former provisions of AS 11.15.030 which provided:

   *Second degree murder.* Except as provided in §§ 10 and 20 of this chapter, a person who purposely and maliciously kills another is guilty of murder in the second degree, and shall be sentenced to imprisonment for a term of not less than 15 years to life.

   In its recent revision of the state's criminal statutes, the Alaska legislature repealed those sections, effective January 1, 1980. Ch. 166, § 21, SLA 1978. The conduct proscribed in that section is now covered by AS 11.41.110.

by the Juneau police, he stated that Sharclane stopped on the bridge, turned and faced Castillo in a fighting position and that the two once again began to struggle with one another. Castillo stated that he then threw Sharclane off the bridge.

On November 17, 1977, Eli Sharclane's grandfather filed a missing persons report. The Juneau police began an investigation shortly thereafter, and on December 8, 1977, a grand jury was convened to consider the matter. At the close of the state's evidentiary presentation, the grand jury indicted Castillo for second degree murder. Following a jury trial, Castillo was found guilty of attempted murder. This appeal followed.

### Failure to Dismiss the Grand Jury Indictment

Castillo first argues that the trial court erred in denying his motion to dismiss the indictment. He contends, among other things, that the indictment should have been dismissed because his confessions and admissions were improperly submitted to the grand jury since there was insufficient independent evidence to establish the *corpus delicti* of the crime charged.[2]

■ The function of the *corpus delicti* doctrine[3] was discussed in *Armstrong v. State*, 502 P.2d 440 (Alaska 1972):

> It is a settled principle of American jurisprudence that a criminal conviction must rest on firmer ground than the uncorroborated confession or admission of an accused. To avoid convicting a person

solely out of his own admissions, the law requires, for a case to be submissible to the trier of fact, additional independent evidence. Thus, in a homicide case, there must be independent evidence of (1) the fact of death which (2) was caused by criminal agency of another before the question of guilt of this defendant could be submitted to the jury.

*Id.* at 447 (footnotes omitted). Under the test developed in *Armstrong*, to justify submission of the defendant's statement to the trier of fact there must be "substantial independent evidence which would tend to establish the trustworthiness of the statements." *Id.* at 447, *quoting Opper v. United States*, 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101, 109 (1954). In the instant case, Castillo maintains that the state failed to establish by substantial independent evidence the fact of death caused by the criminal agency of another.

The state, in order to establish the necessary evidence to warrant Castillo's indictment, marshalled the following evidence. A police check indicated that Sharclane had not departed from Juneau since September 24th via any scheduled or nonscheduled airline or by the state ferry system. Similar checks with villages and other communities where Sharclane had ties were also negative, as was a nationwide listing of him as a missing person on the NCIC Computer system. Friends of his, including his girlfriend whom he had expressed a desire to marry, had not seen him since just prior to the incident, nor had his sister, his father, his

---

**2.** Castillo's argument assumes that proof of the *corpus delicti* is required at the indictment stage, just as it is at trial. The briefs of both parties fail to address this issue, but at oral argument the state indicated that it was *not* contending that such proof is unnecessary in proceedings before the grand jury. Given the state's position on the matter, we have assumed for purposes of this appeal that Castillo is correct. However, we need not decide this precise issue, since we have concluded that even if required, there *was* sufficient proof of the *corpus delicti* to support the indictment in this case.

**3.** For an interesting discussion of the origins of the doctrine, see R. Perkins, Criminal Law 97–

100 (2d ed. 1969). Of particular interest is his summary of Perry's Case, 14 How.St.Tr. 1312 (1661), described by Professor Perkins as "the most astounding case of its kind on record." In Perry, a mother and her two sons were convicted and hanged after one of the sons gave a confession implicating all three in the supposed robbery and murder of one Harrison. Although the mother and her other son insisted that the confession was a complete fabrication, the son who had confessed steadfastly maintained that his story was true until the time of his death. A few years later the "victim," Harrison, reappeared, apparently little the worse for wear. *Id.* at 98–99.

grandfather, or his aunt. Several witnesses did, however, testify that they had seen or might have seen Sharclane after the night in question.[4]

Conflicting evidence was presented as to whether Sharclane could swim. Sharclane's sister claimed he could swim even though she had actually never seen him do so. However, a friend of Sharclane's and Sharclane's father testified that he was unable to swim, and that he had always been afraid of the water. Testimony also indicated that on the evening of his disappearance, Sharclane was in the possession of a quart of vodka, and was "well on his way." Moreover, Sgt. Windred, who investigated the scene of the incident, testified that under tide conditions believed to have existed on the night in question there was forty-nine feet between the railing and the water.

Further evidence, independent of Castillo's statements, was introduced to show the fact of Sharclane's death and the fact that his death was caused by the criminal agency of another. While there was no eyewitness who saw the men fighting on the bridge, or saw Sharclane thrown from the bridge, a Ms. Conidi saw Sharclane running across the bridge on the night in question, and testified that she heard moaning or sobs coming from the bridge shortly after the incident occurred. Brian Cropley saw Sharclane and Castillo fighting on the Douglas side of the bridge, and then saw Castillo chasing Sharclane over the bridge towards Juneau.

Additionally, Castillo's fiancee stated that she had been raped by Sharclane about three years earlier. According to Albert Valentine, a friend of Castillo's, Castillo "didn't like" the fact that this had occurred, and stated about two weeks before the incident that he intended to throw Sharclane off the bridge. Tony Goynas told the jurors that Castillo "might have mentioned" his desire to fight Sharclane because Sharclane had been talking to his "old lady." [5]

■ To establish the *corpus delicti* of murder the state may rely on pre-crime statements of the defendant. Perkins, *The Corpus Delicti of Murder*, 48 Va.L.Rev. 173, 178 (1962), citing *Warszower v. United States*, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876 (1941). According to Professor Perkins, these statements contain none of the inherent weaknesses of confessions or admissions after the fact. *Id.*

■ The defense, in an attempt to show that the evidence was insufficient to prove criminal activity on the part of the defendant, relies on testimony showing Sharclane's propensity for violent behavior and that he was generally not well liked in the community. All of this testimony, however, was introduced at trial; it was never brought before the grand jury. Thus, the problem with Castillo's argument is two-fold: first, testimony elicited during trial has no bearing upon the issue of whether the state presented to the grand jurors evidence sufficient to establish the *corpus delicti* of the crime, and second, our *corpus delicti* doctrine does not require proof that the criminal activity was that of the defendant charged. *Armstrong v. State*, 502 P.2d at 447. To require proof that the defendant was the killer as an essential

4. One witness stated that he could not remember whether he saw Sharclane in Juneau before or after the incident. A second witness, who thought she might have seen him, indicated the person she thought was Sharclane did not respond to her greeting and testified she believed she was mistaken in her identification. Further testimony came from a close friend of Castillo's, Tony Goynas, who stated he had seen Sharclane three days after the fight. Goynas' friendship with Castillo would, of course, be a factor to be considered in determining the credibility of his testimony.

5. Castillo attempts to discredit these statements. He points out that at trial Goynas denied that Castillo ever expressed a desire to fight Sharclane. Castillo also stresses several inconsistent statements Valentine made at trial. Under cross-examination, Valentine admitted that it was possible that his conversation with Castillo occurred after the incident. The issue, however, is whether there was sufficient evidence before the grand jury to warrant the indictment. Pointing out changes in testimony subsequently occurring at trial does nothing to assist this court in making that determination.

element of the *corpus delicti* was characterized by Wigmore as "absurd."[6] Generally, proof of the " 'criminal agency of another' requires evidence which tends to show that the deceased died, not as a result of natural or accidental causes, or by his own hand, but by the hand of another." Perkins, *supra* at 193 (footnote omitted).

We conclude that the state presented sufficient independent evidence to establish the *corpus delicti* of the crime charged.[7]

Castillo's second challenge to the validity of the grand jury indictment is that hearsay testimony was improperly presented to the grand jury. At the time the grand jury was convened, the prosecutor believed the incident on the bridge occurred during the early morning hours of Saturday, September 24th, rather than on Sunday the 25th. Robert Hanson, Sharclane's grandfather, testified before the grand jury that he had seen his grandson at a volleyball game on Saturday, September 24th. This testimony was crucial because, if believed, it established that Sharclane had been seen after the fight in which he was supposedly killed.

Following Mr. Hanson's testimony, Mrs. Mayeda, a resident of Hoonah, was recalled to determine whether Mr. Hanson had really seen Eli on Friday the 23rd or Saturday the 24th, since volleyball tournaments were held on both days. She testified that her children told her husband, who in turn told her, that they were to be in Juneau on Saturday at a volleyball tournament. This testimony was, of course, hearsay. Mrs. Mayeda then stated that to confirm this, she called her husband to check when her children had played in the games because she knew her husband had retained their written permission slips specifying the days they were to be in Juneau. At this point, the district attorney told her to testify only

from her own memory. In response, Mrs. Mayeda testified that her own recollection was that she knew her children were going to be in Juneau that Saturday. She was then asked: "Do you know if they were over there on Friday?" She responded, "According to my memory that were was only that Saturday I know of." Castillo contends this left the grand jurors with the impression that Mrs. Mayeda called her husband, and learned that her children were in Juneau on both Friday the 23rd and Saturday the 24th; that this hearsay statement made it possible for the jurors to infer that Mr. Hanson had not seen Sharclane on Saturday the 24th but rather, he had seen him on Friday the 23rd. Had Mr. Hanson's testimony remained uncontroverted, argues Castillo, the indictment for second degree murder would be unjustified because it would establish that the victim did not disappear until the day after the bridge incident.

Hearsay testimony which is not subject to a recognized exception may be presented to the grand jury only upon a showing of "compelling justification." Rule 6(r), Alaska R.Crim.P.; *Adams v. State*, 598 P.2d 503, 508 (Alaska 1979) (footnote omitted). For these purposes, "compelling" is to be equated with "necessity." *Id.* (citation omitted). In the instant case, no justification was given as to why Mrs. Mayeda's husband was not called as a witness. Therefore, a finding of "necessity" cannot be supported. *See State v. Gieffels*, 554 P.2d 460 (Alaska 1976); *State v. Johnson*, 525 P.2d 532 (Alaska 1974). However, we are not convinced that Mrs. Mayeda's testimony was sufficiently tainted so as to invalidate Castillo's indictment.

After Mr. Hanson and Mrs. Mayeda testified, Donna Sharclane, the victim's sister, testified that the volleyball games were

---

**6.** 7 Wigmore, Evidence § 2072, at 526 (Chadbourn rev.ed. 1978).

**7.** This holding also disposes of Castillo's argument that proof of the *corpus delicti* at trial was insufficient, despite the fact that at trial additional evidence was presented indicating that Sharclane might still be alive. That evi-

dence consisted of the testimony of Miranda John, who stated that she received three letters from Sharclane, two of which were purportedly written after the time of his alleged death. The two letters, however, were not produced, and John's trial testimony was inconsistent in certain respects.

played on both Friday and Saturday. She was questioned specifically on this point by one of the jurors. A second witness gave further support to this fact. Given the direct testimony of two other witnesses, the jurors could reasonably conclude that the games were held on both Friday the 23rd and Saturday the 24th. In *Webb v. State*, 527 P.2d 35 (Alaska 1974) (per curiam), this court affirmed a denial of a motion to dismiss an indictment where "there was adequate direct testimony to justify the indictment . . . [and] the hearsay testimony [presented to the grand jury] was either peripheral or cumulative to direct testimony." *Id.* at 36 (footnote omitted). We conclude that the same situation exists in the case at bar.

Castillo next contends that the indictment should be dismissed because the prosecutor improperly influenced the grand jury and failed to adequately advise the jurors on the law applicable to the case. Specifically, Castillo argues that the prosecutor restrained the jurors from questioning the witnesses. At the commencement of the grand jury proceeding the prosecutor stated:

It is going to be a long day. There are fifteen witnesses that have been subpoenaed to come in today. I will put questions to each one of those. If you have important things that you feel like I have overlooked, ask them. *I would ask you, if you could, to restrain yourselves, because it is going to be a long day.* [Emphasis added.]

Castillo further complains of a statement made by the prosecutor at the close of the proceedings that day. After the jurors had asked a witness several questions, the foreman asked: "If we should come to a point where we think we need the testimony of one of the witnesses, again, can we recall them at all?" To this the prosecutor responded:

You have the right to call anybody who you think would explain away a person's guilt. If you feel that you just have to

have somebody's testimony again, come back in and tell us about [it] and let's discuss it. The logistics are a problem in some cases, so, we might—we might have to make some extraordinary arrangements, but if you run into that problem, let us know and we'll see.

Although Castillo claims these comments restrained the jurors from asking the witnesses questions, he does not claim these comments resulted in the exclusion of any exculpatory evidence. Furthermore, after he had questioned each witness, the prosecutor asked the jurors if they had any further questions. In response to this offer, the grand jurors on several occasions pursued further questioning.

Castillo also contends that the prosecutor improperly gave his opinion on the evidence. He cites an instance where the prosecutor explained the length of time needed for premeditation, and a juror then asked how long the defendant must plan. The prosecutor responded: "I think that perhaps after you hear all the evidence, then if you have other questions along this line then we can get into it. *I don't think you'll have questions.*" [Emphasis added.] In response to Castillo's complaint, the state argues that he could not have been prejudiced by this remark since the jury did not indict for first degree murder.

The superior court, when confronted with Castillo's motion to dismiss, held that the conduct of the prosecutor was "not such as to fall outside the boundaries set forth in *Coleman v. State*, 553 P.2d 40 (Alaska 1976)." *Coleman* involved a grand jury proceeding in which the state was attempting to indict the defendant for rape. The foreman requested that a witness be brought before the jury to explain the result of a physical examination taken of the victim. The prosecutor, refusing to bring in the doctor, stated: "I don't think calling a doctor is needed. I think you've heard enough to have this person tried. . . . [a]nd we can't go calling in experts on every case." *Id.* at 49. In *Coleman* we compared

the prosecutor's conduct with that of the prosecutor in *Anthony v. State*, 521 P.2d 486 (Alaska 1974),[8] and found no undue prosecutorial influence.

The state concedes that the grand jury proceedings in the case at bar were not conducted "in the most prudent prosecutorial tradition." However, in comparing the instant case with *Coleman*, we think the prosecutor's conduct was not so egregious as to fall outside its boundaries. This would seem especially true in light of the fact that the record indicates the grand jurors repeatedly asked questions of various witnesses. We therefore conclude that the prosecutor's conduct was not so unduly influential or prejudicial to warrant dismissal of the indictment.

Finally, Castillo contends that the grand jury should have been instructed that they could indict for a lesser included offense such as attempted murder or manslaughter, or for the crimes of assault with a dangerous weapon, aggravated assault, or assault and battery.[9] This position is further supported, argues Castillo, by a specific inquiry by a grand juror about the defini-

tion of manslaughter and the possibility of an assault charge. In response to the juror's request, the prosecutor stated: "I don't know of any assault charge that would be appropriate."

Responding to Castillo's assertions, the state maintains that there was insufficient evidence to support an indictment of assault with a deadly weapon. The only evidence of a dangerous weapon presented before the grand jury came from the testimony of Brian Cropley who stated Castillo told him that he hit Sharclane with a rock, "I guess." It is the state's position that this would have been a "fragile vessel upon which to launch a prosecution so that it was not unreasonable for the prosecution to steer the grand jury away from such a bill."

Under the American Bar Association Standards, part of a prosecutor's function at the indictment stage is to express his opinion on the legal significance of the evidence presented.[10] In light of the evidence presented in the instant case, the prosecutor's comment that he did not know of any appropriate assault charge would not seem to be unreasonable under the foregoing ABA Standards.

---

8. In *Anthony* the court did not rule on the issue, but stated in a footnote:

> We note with disapproval comments made and solicited by the district attorney before the grand jury, referring to matters which would not have been admissible at trial. The district attorney emphasized Anthony's prior criminal record, adverted to the results of polygraph examinations, expressed his suspicion that Anthony was involved in Fairbanks drug traffic, related evidentiary details of the potential narcotics case being prepared by his office, introduced speculative testimony that a witness fled to New Orleans out of fear of Anthony, and stated, utterly without evidentiary support, that "[w]e know he's been given contracts [to kill]. . . ." We cannot condone such conduct, and we direct the district attorney's attention to § 3.5(b) of the American Bar Association Standards Relating to the Prosecution Function (Approved Draft 1971): "The prosecutor should not make statements or arguments in an effort to influence grand jury action in a manner which would be impermissible at trial before a petit jury."

*Anthony v. State*, 521 P.2d at 496 n.37.

9. The prosecutor originally submitted an indictment for first degree murder to which the grand jury returned a no true bill.

10. *Relations with Grand Jury.* (a) Where the prosecutor is authorized to act as legal advisor to the grand jury he may appropriately explain the law and *express his opinion on the legal significance of the evidence* but he should give due deference to its status as an independent legal body.

ABA Standards Relating to the Prosecution Function and the Defense Function § 3.5, at 87 (Approved Draft 1971) (emphasis added). The commentary to this section notes:

> [W]here the prosecutor must prosecute an indictment returned by the grand jury, it is especially important that he be free to express his opinion. A prosecutor who had conducted an adequate investigation and analyzed the evidence is in a position to furnish guidance to the grand jury on the law and the weight of the evidence and should be free to do so whether this leads to a determination to indict or not to indict.

*Id.* at 88.

Castillo further argues that the prosecutor should have instructed on the lesser included offenses of manslaughter and attempted murder since his failure to do so could have given the grand jury the impression that their failure to return a true bill on second degree murder would have barred further prosecution. However, it appears from the record that the jurors realized that if they voted a no true bill on second degree murder, they would then be given a proposed indictment for a lesser offense.[11]

In *Oxereok v. State*, 611 P.2d 913, Op. No. 2076 (Alaska, 1980), this court, in addressing this issue, approved the American Bar Association Standards Relating to the Prosecution Function and the Defense Function § 3.9(e), at 93 (Approved Draft 1971), which states: "The prosecutor should not bring or seek charges greater in number or degree than he can reasonably support with evidence at trial." However, we also noted with approval the following commentary to that section:

From the prosecutor's point of view, the charging decision is one which must be made at an early stage when all the evidence is not necessarily before him in the form it will take at trial. He must make a preliminary evaluation in order to proceed, knowing that at several later stages he may dismiss some charges or may be compelled to elect. He should not be forced to make these crucial decisions in the pre-indictment stage; hence he may charge in accordance with what he then believes he can establish as a prima facie case. . . . The boundary line which separates so-called "overcharging" from the sound exercise of prosecutorial discretion is too vague and subjective to make this a matter for more definitive treatment than as stated in section 3.9(e). Obviously, a prosecutor must have a broad discretion at the charging stage; the trial court in turn has ultimate power

to deal with abuse of the prosecutor's discretion.

*Id.* at 98.

▇ In light of the testimony presented to the grand jury we are unable to say that the prosecutor in the case at bar abused his discretion in failing to suggest the possibility of an indictment for some lesser included offense.

### *Failure to Suppress the Defendant's Statement*

We now turn to Castillo's allegations of error committed at trial. He contends that his initial statement made on November 29, 1977, was the product of custodial interrogation, and therefore should have been suppressed pursuant to the exclusionary rule.[12]

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court held that any statement taken without the required warning of the defendant's rights, if the result of custodial interrogation by the police, must be suppressed. The Court in *Miranda* defined custodial interrogation as "questioning initiated by law enforcement officers *after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.*" *Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706 (footnote omitted; emphasis added). In *Hunter v. State*, 590 P.2d 888 (Alaska 1979), we elected to use an objective, reasonable person standard in determining whether one is "in custody." Although this determination is to be made on a case-by-case basis, the *Hunter* decision provides the following general guidelines:

"[I]n the absence of actual arrest [the inquiry is whether] something . . . [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates [to the defendant] that they would not have heeded a request to depart or to allow the suspect to do so."

11. This is particularly true in light of the fact that when the jurors returned a no true bill on the original proposed indictment for first degree murder they were then given the proposed indictment for second degree murder.

12. Castillo stated that he had been involved in a fight with Sharclane and threw him off the bridge.

This requires some actual indication of custody, such that a reasonable person would feel he was not free to leave and break off police questioning.[13]

In *Hunter* we noted three groups of facts relevant to making this determination:

The first are those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Id.* at 895 (footnote omitted).[14]

Applying this test to the case at bar, the following facts surrounding the interview with Castillo are significant. At about 3:30 p. m. on November 29, 1977, Officer McCracken and Sgt. Windred went to Castillo's place of employment, the Alcoholism Control Agency (hereinafter ACA) which was located in the same building as the Juneau police department, and asked for Castillo. Dressed in civilian clothes, they advised him they were police officers and told him they were there concerning the disappearance of Eli Sharclane. According to Officer McCracken, Castillo "agreed to come down [to the police station] with us." The facts are not clear, however, as to whether or not Castillo realized he could refuse to accompany the officers.[15] In any event, Castillo did go downstairs to the police station and was taken to an interview room. The room was described as a windowless room, approximately eight by eleven or twelve feet, with plasterboard walls painted in pastel colors. It contained a table with several chairs, and the so-called *Miranda* warning was hung on the wall in a picture frame.

It should be noted that before the officers questioned Castillo, they had interviewed three witnesses concerning the fight on the bridge. At that time, however, the officers "had some doubt" whether the fight was between Sharclane and Castillo. The officers further testified that Castillo was not considered a prime suspect at the time.

The officers were unable to recall precisely what happened once Castillo was brought into the interview room. McCracken testified that Castillo was informed of "what we were investigating" and was asked no questions. Windred testified that he told Castillo they were looking into a "missing person thing" and that he didn't "believe he asked Castillo any questions at this juncture and

---

**13.** 590 P.2d at 895, *quoting United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970) (footnote omitted).

**14.** This test has recently been applied in *State v. Cassell*, 602 P.2d 410 (Alaska 1979), and *Quick v. State*, 599 P.2d 712 (Alaska 1979).

**15.** At the evidentiary hearing McCracken testified that he did not recall whether Castillo was specifically told "he had a choice as to whether or not to come down" to the police station. The following exchange took place when Windred was asked a similar question:

Q. Did you tell him he was free to stay up at ACA?
A. I didn't use those words, no.

. . . . .

A. I can't recall exactly what I said, but I asked him if he would come down with us to talk to us.

And at trial Windred responded to the following question asked by Castillo's attorney:

Q. You just asked him to come along voluntarily and gave him the option not to come along?
A. Yes, sir.

that he did not intend to."[16] Castillo told the officers that he had been involved in a fight with Sharclane, and had thrown him off the bridge. Testimony indicates Castillo had been in the room only a minute or two before making the statement.

Following this remark, the officers left the room, called the district attorney, and then returned to the room, at which point McCracken first informed Castillo of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A taped statement was taken in the presence of both Officer McCracken and Sgt. Windred; the interview lasted approximately three hours, from about 3:30 p. m. to 6:30 p. m.[17] After the interview, Castillo was told that he was free to go, and he returned to the ACA office. Matt Felix, Castillo's employer, testified that Castillo appeared frightened.

These facts were presented at an evidentiary hearing before the superior court. The court found that Castillo's initial remark was not the product of custodial interrogation. Specifically, the superior court stated:

> In the instant case, at the time he made his initial remark, Defendant was not the suspect of a particular crime. He was not confronted with incriminating evidence. Like [the situation in *Oregon v. Mathiason*, 429 U.S. 492 [97 S.Ct. 711,] 50 L.Ed.2d 714 (1977)], he was not placed under arrest, nor was his freedom to depart restricted in any way. The police did nothing, either in their manner of

approach or in the tone or extent of their initial questioning, ("what happened"), which would indicate that they would not have heeded a request to depart or have allowed him to do so. This case does not present a situation where information in the hands of the police was such that the Defendant was not free to leave from the moment he entered the interview room. Rather, the officers admit that Defendant could have left at any time,[18] as there was no evidence upon which to hold him for any offense. The questioning conducted before the *Miranda* warnings were given was consistent with questioning the only witness who apparently might have known of Eli Sharclane's whereabouts.

. . . He had not been accused of any crime, nor did the police know that a crime had been committed. It cannot be said that the police were carrying out a process of questioning tending to elicit incriminating statements at the time he made his initial remark.[19]

On appeal of a denial of a motion to suppress, we will review the record in the light most favorable to upholding the trial court's ruling. *Stumbaugh v. State*, 599 P.2d 166, 172–73 (Alaska 1979). Viewing the record in that light, and applying the *Hunter* test, that is, would an objective, "reasonable person" placed in the shoes of the defendant believe that he had been deprived of his freedom in any significant way, we are unable to say that the trial court clearly erred in finding that Castillo's inculpatory statement was not the product

---

The transcript contains no indication that Castillo ever denied he accompanied the officers voluntarily.

16. The transcript of the evidentiary hearing indicates that Castillo was asked general questions such as, "what happened."

17. After McCracken read Castillo his rights, the officers left the interview room to allow Castillo to use the telephone. They left the telephone book opened to the listings of attorneys. However, Walter Share, Castillo's attorney, testified that he never received a phone call from him during that day. It should also be noted that when the officers left the room they were confronted by Matt Felix, Castillo's employer. When Felix expressed a desire to

see Castillo, the officers refused to allow him to do so. It thus appears from the record that Castillo had no outside contacts during the three hour interview.

18. Nowhere in the record do we find evidence to support the superior court's statement that "the officers admit that Defendant could have left at any time." The lack of such evidence, however, is not critical to the court's overall conclusion that no custodial interrogation took place.

19. When the superior court ruled, it did not have the benefit of the *Hunter* decision before it.

of custodial interrogation. There was no indication that he was in custody when the officers asked Castillo if he would go downstairs to talk to them about the disappearance of Sharclane; at this point he was not considered a suspect. He was in the interview room for two minutes at most before he made his initial statement and he made the statement before the police had asked him any specific questions.

The facts in the case at bar are significantly different from those in *State v. Cassell*, 602 P.2d 410 (Alaska 1979), where we held that the defendant's statements *were* the product of custodial interrogation. In that case, Cassell was transported by two policemen from Eagle River to police headquarters in Anchorage. Both officers testified that had Cassell refused to go with them in the patrol car "he would have been arrested at that time." *Id.* at 414. Furthermore, the police already had in their possession a warrant for Cassell's arrest but did not serve it on him until after the interrogation. At the station, Cassell was interrogated for two and one-half hours using the "friendly-unfriendly" technique. *Id.* at 415. Given these circumstances, we held "that a reasonable person, in the accused's position, would have assumed that he was not free to break off the interrogation and leave the officers' presence without their permission." *Id. See also Quick v. State*, 599 P.2d 712 (Alaska 1979).

For the reasons stated, we hold that Castillo's statement was admissible and that the superior court properly denied his motion to suppress.

### Denial of Defendant's Proposed Instruction on Self-Defense

Claiming that there was evidence that he had acted in self-defense, Castillo submitted several instructions on that issue. All were rejected by the trial court. Castillo maintains that the court thus committed reversible error.

It is a well-established rule of law that an aggressor forfeits the right to claim self-defense except in two situations: (1) where an aggressor using non-deadly force (*i. e.*, one who begins an encounter, using only his fists or some non-deadly weapon) is met with deadly force, the initial aggressor may justifiably defend himself against the deadly attack; (2) when an aggressor withdraws from the altercation that he has started, he may then defend himself from further attack. This, however, requires actual notice of his intent to withdraw or at least that he take reasonable steps to give such notice. W. La Fave & A. Scott, Criminal Law § 53, at 395 (1972).

The facts in the case at bar, even when viewed in the light most favorable to the defense, simply fail to support either of these exceptions. Where there is no evidentiary basis for an instruction on the law of self-defense, no such instruction need be given. *Des Jardins v. State*, 551 P.2d 181, 189 (Alaska 1976); *Gray v. State*, 463 P.2d 897, 909 n. 20 (Alaska 1970).

AFFIRMED.

BOOCHEVER, J., not participating.