Brian WARING, Appellant,

v.

STATE of Alaska, Appellee.

Scott P. ROBINSON, Appellant,

v.

STATE of Alaska, Appellee.

Nos. 5094, 5110.

Supreme Court of Alaska.

Sept. 9, 1983.

Mary E. Greene, Asst. Public Defender, Fairbanks, Brian Shortell, Public Defender, Anchorage, for appellant Brian Waring.

James D. DeWitt, Call, DeWitt & Barrett, Fairbanks, for appellant Scott P. Robinson.

Elizabeth H. Sheley, Asst. Atty. Gen., Anchorage, Wilson F. Condon, Atty. Gen., Juneau, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

COMPTON, Justice.

The primary issue in this petition for hearing from the court of appeals is whether Alaska's exclusionary rule, set forth in Evidence Rule 412, contains a standing requirement for search and seizure violations. We affirm the court of appeals' holding that Rule 412 contains a standing requirement, but hold that under the Alaska Constitution there are exceptions to this requirement. Accordingly, we remand the case to the superior court to determine whether such exceptions are applicable in this case. We also reverse the court of appeals' holding that none of the initial actions taken by the State Troopers constituted an unlawful seizure.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts relevant to this petition are as follows.[1] On April 30, 1979, at about 1:30 a.m., State Troopers McGinnis and Ochs were traveling down Sheep Creek Road outside Fairbanks when they saw three young men standing next to a parked car in a roadside turnout. Before stopping to investigate, McGinnis called in the license number of the car and ascertained that it was properly registered and not stolen. As the Troopers approached the car, two of the men, G.R. and T.C., both minors, got down underneath the car and appeared to be inspecting it. McGinnis asked the man standing, Randy Robinson,[2] whether anything was wrong. Randy replied that they had a problem with the tie rods on the car, but that they did not need assistance.

---

1. For a more detailed recitation of facts, see *G.R. v. State*, 638 P.2d 191, 194–95 (Alaska App.1981).

2. Trooper McGinnis testified that he questioned T.C., but others testified, and neither party disputes, that he actually questioned Randy Robinson.

Trooper McGinnis requested and was given identification. He then instructed Randy Robinson to get in the patrol car, where he questioned him for awhile about the identity of the other two and why they were stopped at the roadside turnout. He ran a record check on their identification, which appeared to be correct. While talking to Randy, McGinnis became suspicious that "something was wrong" because the other two men appeared to be whispering to each other and kept looking toward the woods. On a "lucky guess," McGinnis asked Randy who were the other people that were out in the woods. Randy hesitated and finally said that Brian Waring, the owner of the car, and Scott Robinson were in the woods at their cabin. McGinnis then requested that Randy show him where the cabin was. Before going into the woods with Randy, McGinnis told the other two to stay and wait by the car.

After entering the woods, McGinnis, Ochs and Randy came to a stream. Across the stream, McGinnis saw Appellants Brian Waring and Scott Robinson and saw that one of them was holding a rifle. McGinnis crossed the stream, entered the cabin, and asked Waring and Robinson about the gun. After receiving no helpful information, he went outside and found two guns hidden out of view about twenty feet from the cabin. He radioed in their serial numbers to headquarters and was told that the guns were stolen. McGinnis then asked Waring and Robinson if they knew the guns were stolen; Waring replied affirmatively, but said that he was keeping them for a friend.

All five men were taken to the police station, arriving about 2:40 a.m., and were then questioned separately. Although the Troopers knew that T.C. and G.R. were minors, the parents were not immediately notified that their children were in custody, which violated Children's Rule 6(b).

Mr. Bendock, the victim of a recent burglary, arrived at the station about 4:30 a.m. and identified the guns as his. He also brought a knife and lighter that he had found under the window where the burglars had entered his home. When G.R. was shown the items and heard Mr. Bendock's story, he confessed to the burglary. Upon learning of G.R.'s confession, Waring and Robinson both gave statements. The two that were not involved in the burglary, Randy Robinson and T.C., were released sometime between 6:00 a.m. and 8:00 a.m. G.R.'s parents were first notified that their son was in custody at about 9:15 a.m.

The three defendants, Waring, Scott Robinson, and G.R., moved to suppress most of the evidence against them; the motions were denied. Waring and Robinson were each convicted of burglary in a dwelling under former AS 11.20.080. G.R. was adjudicated a delinquent minor based on the same offense. In *G.R. v. State,* 638 P.2d 191 (Alaska App.1981), the court of appeals affirmed Waring's conviction, but remanded G.R.'s and Robinson's cases for a determination of whether probable cause existed to arrest them at the time they were taken to the police station.[3] Only Waring and Robinson petitioned this court to hear their cases. We granted the petition for hearing to review two holdings by the court of appeals: (1) that the Trooper's interactions with the three men at the car did not constitute an unlawful seizure; and (2) that Waring cannot have his confession suppressed because he has no standing to assert the violation of his co-defendants' right against an unlawful seizure.

Waring and Robinson argue that Trooper McGinnis' initial contact with the three men at the car was an unlawful seizure and that all incriminating evidence obtained thereafter should accordingly be suppressed. Waring also argues that because he confessed only after G.R. confessed, and because G.R.'s confession is inadmissible if the superior court on remand finds that there was no probable cause to arrest G.R., his confession must also be suppressed. Underlying both of these arguments is the contention

---

**3.** If the superior court finds on remand that there was no probable cause to arrest G.R. and Robinson, then their subsequent confessions were inadmissible, and the judgments against them must be reversed. *G.R. v. State,* 638 P.2d at 205.

that Waring and Robinson have standing to assert the violation of someone else's constitutional rights.[4] Addressing Waring's and Robinson's seizure argument, the court of appeals found that the initial police encounter with the three men was not an unlawful seizure; therefore, the court did not discuss the standing issue. *G.R. v. State,* 638 P.2d at 196. The court discussed standing, however, with respect to Waring's confession argument and held that Waring did not have standing to assert the violation of his co-defendants' rights. *Id.* at 204.

## II. STANDING TO ASSERT THE VIOLATION OF A CO–DEFENDANT'S RIGHTS

In reaching its conclusion that Waring did not have standing to assert the violation of a co-defendant's rights, the court of appeals held that the adoption of Alaska Evidence Rule 412,[5] an exclusionary rule, did not abrogate the traditional requirement of standing in search and seizure cases. 638 P.2d at 204. We agree with the reasoning behind this holding.

Evidence Rule 412, which became effective on August 1, 1979, superseded Criminal Rule 26(g).[6] As we indicated in *State v. Sears,* 553 P.2d 907 (Alaska 1976), the notes of the Criminal Rules Revision Commission, which drafted Rule 26(g) in 1972, state that Rule 26(g) was proposed " 'to make clear that the protections of the Miranda Rule are not eroded.' " 553 P.2d at 910.[7] There is nothing, however, in these notes or in subsequent case law[8] which indicates that Rule 26(g) addressed the standing issue in search and seizure cases.

■ Evidence Rule 412 did not abolish the standing requirement in search and seizure cases. Although the standing issue is not addressed in the text of the Rule, the Commentary to Rule 412 indicates as much. The Commentary discusses the two exceptions in Rule 412 to the general exclusionary rule, both of which regard the use of illegally obtained evidence in perjury prosecutions. It states, in part:

> The second exception governs evidence obtained in violation of the fourth amendment and/or its Alaska counterpart, article I, section 14. Again a limitation is imposed: the evidence ... must not have been obtained "in substantial violation of rights." ... The simple ref-

4. Waring contends that there is no standing issue. Instead, his confession should have been ＿uppressed under the fruit of the poisonous tree doctrine, see *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 453–54 (1963), because it was directly linked to the illegal arrest and tainted confession of his co-defendants, Robinson and G.R. We disagree. The court of appeals was correct in first resolving whether Waring had standing to assert the violation of his co-defendants' rights. The poisonous tree doctrine arises only if standing is found.

5. Alaska R.Evid. 412 states:
   Evidence illegally obtained shall not be used over proper objection by the defendant in a criminal prosecution for any purpose except:
   (1) a statement illegally obtained in violation of the right to warnings under *Miranda v. Arizona,* 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), may be used in a prosecution for perjury if the statement is relevant to the issue of guilt or innocence and if the prosecution shows that the statement was otherwise voluntary and not coerced; and
   (2) other evidence illegally obtained may be admitted in a prosecution for perjury if it

is relevant to issue of guilt or innocence and if the prosecution shows that the evidence was not obtained in substantial violation of rights.

6. Alaska R.Crim.P. 26(g) stated: "Evidence illegally obtained shall not be used for any purpose including the impeachment of a witness."
   Rule 26(g) was in effect when the evidence in this case was seized and when the suppression hearing took place; Rule 412, however, was in effect when oral arguments on the motion were subsequently held and when the motion was denied. The applicability of Rule 412 was not contested by the state.

7. For a discussion of the Commission's notes and the history and policy behind Rule 26(g) with respect to standing to assert *Miranda* rule violations, see *State v. Sears,* 553 P.2d 907, 910–11 (Alaska 1976).

8. *Sears* discussed the standing issue only to show that there is nothing in the history and policy of Rule 26(g) to require applying the exclusionary remedy in probation or parole revocation proceedings. 553 P.2d at 910–11.

erence to "rights" is intended to emphasize that *this section has no bearing on the law of standing in search and seizure cases.*

Alaska R.Evid. Commentary at 104–05 (emphasis added). The express language of the Commentary indicates that Rule 412 has "no bearing"—no effect—on the standing requirement, which implies that some form of a standing requirement remains intact. We believe that the Commentary accurately reflects the conclusion that the scope of Evidence Rule 412 is limited by the standing requirement in search and seizure cases.

The extent to which the standing requirement limits the exclusionary rule is a question of first impression in Alaska. Nevertheless, two previous decisions concerning the scope of the exclusionary rule, *Elson v. State,* 659 P.2d 1195, 1202 (Alaska 1983), and *State v. Sears,* 553 P.2d at 912, provide some guidance. In *Elson* and *Sears,* we held that the determination of whether the exclusionary rule applies to certain post-trial proceedings required a balancing of the purpose behind excluding illegally obtained evidence and the interest in admitting reliable evidence in those proceedings.

The purpose of the exclusionary rule is two-fold: to deter police from using unconstitutional methods of law enforcement, *Mapp v. Ohio,* 367 U.S. 643, 656, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081, 1091 (1961), and to preserve the integrity of the judicial system by not permitting the courts to be a party to the lawless invasion of a citizen's constitutional rights. *Terry v. Ohio,* 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889, 901 (1968); *Sears,* 553 P.2d at 912.

In *Elson* and *Sears,* we noted that police generally conduct searches and arrests for the purpose of prosecuting and convicting an individual, not to enhance the sentence or revoke the parole of a defendant; therefore, the deterrent effect of excluding evidence in sentencing and probation proceedings would be minimal. *Elson,* 659 P.2d at 1203–04; *State v. Sears,* 553 P.2d at 912.

In both cases, we concluded that this marginal deterrent value was outweighed by the needs of the probation and sentencing systems. *Elson,* 659 P.2d at 1202; *Sears,* 553 P.2d at 913. Nevertheless, we recognized that under some circumstances the deterrent effect of applying an exclusionary rule in probation and sentencing proceedings would be significant, e.g., if the illegal searches and arrests were consciously directed toward those proceedings. In *Sears* we stated:

> In the event the lawless arrest and search or seizure is carried out by enforcement personnel with knowledge or reason to believe the suspect was a probationer, we would then apply the exclusionary rule in the probation revocation proceeding. For, in such a circumstance, the bar of the exclusionary rule would act as a significant deterrent to searches and arrests consciously directed toward probationers.

553 P.2d at 914. Following this reasoning, we held in *Elson* that if evidence was obtained for purposes of influencing the sentencing court, then it is inadmissible at sentencing. 659 P.2d at 1204 n. 28.

In considering whether a defendant has standing to assert the violation of a co-defendant's rights in search and seizure cases, we must also balance the competing interests, i.e., whether the interest in introducing reliable evidence that was obtained in violation of a co-defendant's fourth amendment rights outweighs the deterrent effect of excluding such evidence.

Similar to our holdings in *Sears* and *Elson,* we believe that law enforcement officers generally conduct searches and seizures of an individual's person or property for the purpose of prosecuting that individual, rather than for the purpose of prosecuting a co-defendant. If a search or seizure were unlawful, any resulting evidence would be excluded at the trial of the defendant whose rights were violated.[9] To apply the exclusionary rule a second time in a co-defendant's trial would not serve any addi-

---

**9.** If no opportunity to exclude the illegally obtained evidence arises, e.g., if the party whose rights were violated was not involved in any criminal wrongdoing, the wronged individual has a civil remedy under 42 U.S.C. § 1983.

tional deterrent purpose. In *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the Supreme Court balanced this marginal deterrent effect against the need for reliable evidence at trial and decided not to abolish the standing requirement.

The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth.

394 U.S. at 174–75, 89 S.Ct. at 966–67, 22 L.Ed.2d at 187.

Although we agree with the Supreme Court that allowing standing to assert the violation of a co-defendant's rights would not deter unlawful conduct in most situations, we believe deterrence would be furthered by such an allowance when the unlawful conduct is intentionally directed toward a particular defendant. The facts of *Dimmick v. State,* 473 P.2d 616 (Alaska 1970), which discusses the standing rule in the context of fifth amendment violations, illustrate the need for this exception to a standing requirement. Dimmick's co-defendant, Herman, requested an attorney after being given *Miranda* warnings. The police interrogated Herman without complying with his request, and his subsequent statement was used against Dimmick at Dimmick's trial. A police officer testified at trial that the violation of Herman's rights was directed toward Dimmick: " '[T]he decision was made to go ahead and interview [Herman] after he had requested an attorney full-well knowing that then this confession could not be used against him but merely for the value of the confession

against Mr. Dimmick.' " 473 P.2d at 619. If the police knew that the unlawful confession could not have been used against Dimmick, there would have been no reason to violate Herman's rights. Thus, the deterrent effect of applying the exclusionary rule would be significant when a particular defendant is the target of the violation of another person's constitutional rights.

Turning to the other purpose of the exclusionary rule, we have indicated that judicial integrity requires the exclusion of evidence if it is obtained by gross or shocking police misconduct:

We can conceive of circumstances which would lead to the application of the exclusionary rule to revocation of probation proceedings. *E.g., Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). In short, police misconduct which shocks the conscience, or is of a nature that calls for the judiciary, as a matter of judicial integrity, to disassociate itself from benefits derivable therefrom, would lead us to invoke the exclusionary rule.

*State v. Sears,* 553 P.2d at 914.

Furthermore, we believe that both purposes of the exclusionary rule, deterring misconduct and preserving judicial integrity, require the exclusion of evidence when police knowingly and intentionally violate a co-defendant's rights. In *Dimmick,* two of the four participating justices would have reversed Dimmick's conviction on this ground.[10] Justice Rabinowitz objected to the deliberate refusal of the police to grant Herman's in-custody request for assistance of counsel. 473 P.2d at 623 (Rabinowitz, J., concurring in part, dissenting in part). Justice Connor also sought "to apply the exclusionary rule to police conduct which is intentionally or flagrantly illegal." 473 P.2d at 629 (Connor, J., concurring in part, dissenting in part). Underlying this exception to the standing requirement is our refusal to condone improper police conduct. If a defendant were not given standing to assert the knowing violation of a co-defendant's rights, police could be encouraged to inten-

---

**10.** Because of the even split on this issue, we   affirmed the conviction by the superior court.

tionally violate the rights of persons who will not be prosecuted in the hopes that the illegally obtained evidence could eventually be used against another defendant. Refusing to permit standing would represent "an open invitation to adopt such procedures as a standard method for the solution of particular crimes or for conducting generalized crime hunts." *Dimmick,* 473 P.2d at 623 (Rabinowitz, J., concurring in part, dissenting in part).

■ To summarize, we hold that a defendant has standing to assert the violation of a co-defendant's[11] fourth amendment rights if he or she can show (1) that a police officer obtained the evidence as a result of gross or shocking misconduct, or (2) that the officer deliberately violated a co-defendant's rights.[12] In this case, the court of appeals followed the federal rule that a defendant cannot under any circumstances assert the violation of a co-defendant's fourth amendment rights. *G.R. v. State,* 638 P.2d at 204. *See Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 424–25, 58 L.Ed.2d 387, 394 (1978); *Alderman v. United States,* 394 U.S. at 171–72, 89 S.Ct. at 965, 22 L.Ed.2d at 185–86. We therefore find it necessary to remand this case so that a determination can be made whether either exception to the standing requirement is applicable.

### III. UNREASONABLE SEIZURE

■ The remaining issue is whether the initial contact between Trooper McGinnis and Randy Robinson constituted an "unreasonable seizure" as prohibited by the fourteenth amendment to the United States Constitution and article I, section 14, of the Alaska Constitution.[13] Determining wheth-

er the Trooper's contact with Randy was constitutionally permissible requires the following analysis. First, did the encounter amount to a seizure? Second, if so, is the reasonable suspicion exception to the probable cause requirement applicable?

Not all contacts between police and citizens involve "seizures" of persons. The difference between a permissible encounter and a seizure is explained in *Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983):

[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.... Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification.... The person approached, however, ... may not be detained even momentarily without reasonable, objective grounds for doing so .... If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed.

—— U.S. at —— – ——, 103 S.Ct. at 1324, 75 L.Ed.2d at 236 (citations omitted). In *Terry v. Ohio,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16, 20 L.Ed.2d at 905 n. 16, the United States Supreme Court noted that a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen ...." The Supreme Court has

---

**11.** We express no opinion as to whether a defendant can assert the violation of the fourth amendment rights of persons other than co-defendants or co-suspects.

**12.** We believe that only these two exceptions are presently necessary; however, if the goals of deterring unlawful police conduct require, other exceptions may be necessary in the future.

**13.** Waring and Scott Robinson assert that seizures occurred when McGinnis obtained identi-

fication from the three men at the car, when he took Randy Robinson to the patrol car, and when he told the others to stay by the car. They contend that these seizures were constitutionally impermissible and that all incriminating evidence derived from them should have been suppressed. We need not decide whether T.C. and G.R. were seized because it was only the information given by Randy Robinson that lead to incriminating evidence.

not yet developed a test for determining what constitutes a "show of authority." In *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980), the two justices reaching the seizure issue stated that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

▆ In interpreting article I, section 14, of the Alaska Constitution, we will employ an objective standard to determine whether or not a seizure has occurred, i.e., whether or not a reasonable person would believe that he or she was free to go. We recognize that upon being confronted by a police officer, the average person would feel an obligation to respond to the officer's questions and not to walk away. Such a confrontation, therefore, will amount to a seizure "only if the officer added to those inherent pressures by engaging in" "conduct which a reasonable man would view as threatening or offensive even if coming from another private citizen." 3 W. La-Fave, Search and Seizure: A Treatise on the Fourth Amendment § 9.2, at 53, 54 (1978) (footnote omitted). "[T]he critical inquiry would be whether the policeman, although perhaps making inquiries which a private citizen would not be expected to make, has otherwise conducted himself in a manner consistent with what would be viewed as a nonoffensive contact if it occurred between two ordinary citizens." *Id.* (footnote omitted).[14]

In this case, the trial court did not indicate whether any of the actions of Trooper McGinnis constituted a "seizure," stating only that his stopping at the vehicle and crossing the stream were both reasonable actions. In its review of the record, the court of appeals found no seizure at any point because the three men "had no reason to feel that their freedom of movement had been restrained by a show of authority by the officer, since they were not moving anyway and were in no way prohibited from going about their business." 638 P.2d at 196.

▆ After reviewing the record surrounding the initial contact, we conclude that, as a matter of law, the actions of McGinnis constituted a seizure of Randy Robinson.[15] As the court of appeals stated, the Troopers were entitled to stop and inquire if the men, who might have been stranded on the deserted road late at night, needed help. *G.R. v. State,* 638 P.2d at 195, *citing Anchorage v. Cook,* 598 P.2d 939 (Alaska 1979) (contact with person involved in motor vehicle accident is justified by society's interest in furnishing aid to persons). Assuming that a request for identification is not a seizure,[16] Trooper McGinnis was also entitled to request identification and retain it briefly for inspection.[17] When he instructed Randy to sit in the patrol car, however, he was conducting himself in a way a reasonable person "would view as threatening or offensive even if coming from another private citizen." LaFave, *supra,* at 54. Upon such an assertion of au-

14. In *Gomez v. Turner,* 672 F.2d 134 (D.C.Cir. 1982), the court elaborated on this test as follows: "[T]he presence of the officer as a figure of governmental authority does not, by itself, constitute the 'show of authority' necessary to make a reasonable person feel unfree to leave. There must be some additional conduct by the officer to overcome the presumption that a reasonable person is willing to cooperate with a law enforcement officer." *Id.* at 142 (footnote omitted).

15. Whether a seizure has occurred is a question of fact. *Cf. Frink v. State,* 597 P.2d 154, 169 n. 30 (Alaska 1979) (voluntariness of consent is question of fact). As noted above, the superior court did not make a specific finding that a seizure occurred. Assuming it found no seizure, however, we conclude on the basis of the undisputed evidence that this finding was clearly erroneous.

16. Because we hold that a seizure occurred when Randy Robinson was separated from the others, there is no need to resolve whether a request for identification is a seizure.

17. *Cf. United States v. Black,* 675 F.2d 129, 136 (7th Cir.1982) ("retaining [airplane ticket and identification] beyond the interval required for the appropriate brief scrutiny, may constitute a 'watershed point' in the seizure question").

thority, it would have been reasonable for Randy to conclude that he was not free to disobey the Trooper's instructions and go "about [his] business." *G.R. v. State*, 638 P.2d at 196.

Case law in other jurisdictions support our conclusion. In *Commonwealth v. Jones*, 474 Pa. 364, 378 A.2d 835 (1977), an officer observed Jones walking along the highway, apparently hitchhiking. The officer stopped his police car, asked Jones for identification, and asked him to have a seat in the patrol car. In affirming the lower court's finding of a seizure, the court held that the officer "escalated the exercise of force by asking Jones to be seated in the car. This latter request was not merely an attempt to obtain information; rather, while stated as a question, it sought control of Jones' movement." *Id.* 378 A.2d at 840 (footnote omitted). In *People v. Kennedy*, 66 Ill.App.3d 267, 22 Ill.Dec. 905, 383 N.E.2d 713 (1978), a police officer approached the defendant, who was hitchhiking around one a.m., and asked what he was carrying in a brown paper bag. The defendant said that it contained a gun, at which point the officer ordered the defendant to stand at the rear of the squad car. The court held that a seizure took place when the officer asked the defendant to walk to the rear of the car because this "was . . . [an] attempt . . . to control the physical movement of the defendant . . . ." *Id.* 22 Ill.Dec. at 911, 383 N.E.2d at 719. *See also People v. Boodle*, 47 N.Y.2d 398, 418 N.Y.S.2d 352, 354, 391 N.E.2d 1329, 1331 (1979) (seizure occurred when officer asked defendant to get in police car, given facts that officer commanded defendant to keep his hands exposed and that officer without explanation began driving the car); *Hughes v. State*, 588 S.W.2d 296, 299 (Tenn.1979) (seizure occurred when officer "invited" defendant to sit in the rear of patrol car, which had no inside handles or latches and thus could only be exited with someone else's assistance).

■ Having determined that a seizure did occur, the next issue is whether the seizure was constitutionally permissible.

As a general rule, fourth amendment seizures of persons must be based on probable cause to arrest. *Terry v. Ohio* created a limited exception to this rule when the seizure is substantially less intrusive than a traditional arrest and the interest in crime detection and the police officer's safety outweighs the limited violation of individual privacy. 392 U.S. at 20–21, 88 S.Ct. at 1879, 20 L.Ed.2d at 905. *See also Dunaway v. New York*, 442 U.S. 200, 211, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824, 834 (1979). *Terry* applied this balancing test to justify pat-down searches for weapons, and it has since been applied to justify brief investigatory stops in roving border patrols, *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607, 617 (1975), and drug enforcement encounters in airports. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). In such cases, a seizure is permissible only when an officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1879, 20 L.Ed.2d at 906 (footnote omitted). In interpreting article I, section 14, of the Alaska Constitution, we have permitted temporary detention for questioning only when (1) the police officer has an actual suspicion that "imminent public danger exists or serious harm to persons or property has recently occurred," and (2) this suspicion is reasonable. *Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976).

■ The facts in this case do not satisfy the test enunciated in *Coleman*. Before he approached the men, McGinnis called in the license number of the car and ascertained that it was properly registered and not stolen. After receiving their identification, he ran a record check on their identities. Neither of these procedures confirmed McGinnis' suspicion of wrongdoing. When McGinnis took Randy Robinson to the patrol vehicle, he knew of no crime in which the men could have been involved and knew of no warrant for the arrest of any of them. No serious crime had been reported in that

area, nor was there any indication that imminent public danger existed. As McGinnis testified, the basis for his actions was his "impression that something was wrong."[18] To continue the investigation by taking Randy into the police car and questioning him there when McGinnis had no articulable reason to suspect that anything was wrong was too great an intrusion on Randy's freedom. Although it is crucial for law enforcement officials to continue an investigation when suspicious facts warrant it, they cannot embark upon an investigatory course of action "in the hope that something might turn up." *Brown v. Illinois,* 422 U.S. 590, 605, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416, 428 (1975). The public has an interest in solving crime, and McGinnis' investigation eventually solved a particular crime; however, we think that this laudable end does not outweigh Randy Robinson's constitutional right not to be unlawfully seized.

■ Our holdings in other cases are not in conflict with this decision. In cases involving an investigatory stop or pat-down search, *Ozenna v. State,* 619 P.2d 477, 479 (Alaska 1980), *Free v. State,* 614 P.2d 1374, 1379 (Alaska 1980), *Ebona v. State,* 577 P.2d 698, 701 (Alaska 1978), and *Coleman,* 553 P.2d at 46, we recognized that a seizure had occurred, but held that it was justified because the officer had reasonable suspicion that either imminent public danger existed or serious harm to persons or property had recently occurred. In cases involving custodial interrogations, *Hintz v. State,* 627 P.2d 207 (Alaska 1981), *Castillo v. State,* 614 P.2d 756 (Alaska 1980), and *Quick v. State,* 599 P.2d 712 (Alaska 1979), we held that the defendant was not in custody and thus *Miranda* warnings were not required under the fifth amendment.[19] In *Henry v. State,* 621 P.2d 1 (Alaska 1980), we held that the defendant was not "in custody" and thus probable cause to arrest was not required.[20] In each of these cases, the issue of seizure was not discussed. Furthermore, in these cases the police specifically asked the defendant to come to the police station for questioning, and the defendant voluntarily agreed to do so. *Henry,* 621 P.2d at 2–3; *Castillo,* 614 P.2d at 764; *Quick,* 599 P.2d at 717.

## IV. CONCLUSION

We hold that the seizure of Randy Robinson was unreasonable and accordingly pro-

---

**18.** Trooper McGinnis testified:

When I pulled up to the [turnout], I saw the individuals by the car. They turned around and appeared to take notice of a patrol vehicle pulling down in there and I believe immediately two people dropped down underneath the car. And the third person that was standing up . . . turned around, saw me and then their actions from then on out indicated that there might have been something wrong. What, I have no idea. Their whole attitude was simply to, you know, ignore them and maybe they'll go away or something to that effect. Maybe they're not there. I don't know.

**19.** In comparing this case with the custodial interrogation cases, we do not suggest that the question of "custody" for *Miranda* purposes is the same as the question of a "seizure" for fourth amendment purposes. "Merely addressing questions to a suspect may not constitute custodial interrogation for *Miranda* purposes. Yet the authority asserted by the interrogating officer to induce the suspect to stop and listen to those questions may bring the encounter within the fourth amendment's proscription against unreasonable seizures of the person."

Note, "Search and Seizure—Expanding the Permissible Scope of Field Interrogation," 27 Rutgers L.Rev. 571, 576 (1974) (footnotes omitted). *See also* 3 W. LaFave, Searches and Seizures: A Treatise on the Fourth Amendment § 9.2, at 47 n. 98 (1978).

**20.** We note that although the test for finding a seizure—whether a reasonable person would feel free to leave—would apply to a seizure in arrest-like conditions, the latter situation differs considerably from investigatory stops in terms of its scope and duration. *Florida v. Royer,* —— U.S. ——, ——, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) ("It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure."). In that case, the Court held that although reasonable suspicion existed to justify the initial seizure of the defendant, his continued detention in the police room, to which his luggage had also been sent, "was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity." *Id.,* —— U.S. at ——, 103 S.Ct. at 1326, 75 L.Ed.2d at 239.

hibited by the United States and Alaska Constitutions. All evidence obtained as a direct or indirect result of this constitutional violation must be suppressed unless the state can show an attenuation between the unconstitutional conduct and the incriminating evidence. *Dunaway v. New York,* 442 U.S. at 216, 99 S.Ct. at 2258, 60 L.Ed.2d at 838; *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 453–54 (1963); *Cruse v. State,* 584 P.2d 1141, 1145 (Alaska 1978). Before reaching the *Wong Sun* issue, however, Waring and Scott Robinson must show that they have standing to assert the unconstitutional seizure of Randy Robinson, based on one of the standing exceptions discussed above. If on remand the superior court determines that Waring and Robinson have standing to assert the unconstitutional seizures and that incriminating evidence must be suppressed as a result, the convictions must be reversed; no other issues need be reached.

If, however, on remand Waring and Robinson do not prevail on the seizure issue, the court must determine whether probable cause existed to arrest G.R. or Scott Robinson. If not, Robinson's conviction must be reversed. Furthermore, Waring's conviction must also be reversed if the court determines that he has standing to assert the unconstitutional arrest of G.R. or Scott Robinson and that there was no attenuation between the unconstitutional seizure and Waring's confession.

For the reasons discussed above, the case is REMANDED.

MATTHEWS, Justice, dissenting, in part.

I agree that in determining whether a seizure has taken place it is proper to ask whether the policeman has "conducted himself in a manner consistent with what would be viewed as nonoffensive contact if it occurred between two ordinary citizens...." The trial court made no finding on this point, and the parties did not focus on it in eliciting evidence. I would therefore include in the order of remand directions to the trial court to hold a supplemental evidentiary hearing and to make findings as to whether a seizure of Randy Robinson occurred, using the standard announced in today's opinion.

In all other respects I agree with the majority opinion.