**STATE of Alaska, Appellant,**

v.

**Kevin Nelson GREEN, Appellee.**

**No. A–3236.**

Court of Appeals of Alaska.

May 10, 1991.

we find no violation of *Hester v. State*, 777 P.2d 217 (Alaska App.1989).

Nancy R. Simel, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellant.

James D. Gilmore and Eric A. Johnson, Gilmore & Feldman, Anchorage, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

## OPINION

BRYNER, Chief Judge.

The state appeals Superior Court Judge Karl S. Johnstone's order dismissing an indictment that charged Kevin Nelson Green with second-degree murder, first-degree assault, and criminal nonsupport. We affirm.

On September 6, 1987, rescue workers responded to a report of a child who had stopped breathing. They found Green's three-month-old daughter dead. The circumstances were suspicious, since it appeared that Green's daughter had died several hours before help was summoned. Green was unable to explain his daughter's death. He indicated that he had taken a shower; upon emerging, he noticed that his daughter had stopped breathing, and he attempted to provide mouth-to-mouth resuscitation. Green claimed that he then called his wife, who rushed home from work and telephoned for emergency assistance.

An autopsy performed by Dr. Michael P. Propst revealed evidence of prior physical abuse unrelated to the death of the child but failed to establish a precise cause of death. Dr. Propst diagnosed the cause of death as asphyxia from an unknown source. While Propst suspected that the asphyxia probably resulted from abuse, he could not conclusively rule out other causes, such as sudden infant death syndrome. A military physician, Dr. Arnold R. Josselson, reviewed the autopsy reports and agreed with Propst's findings.

The grand jury hearing that led to the current indictment against Green occurred approximately fifteen months after the alleged homicide. Propst and Josselson both testified before the grand jury. To bolster their testimony, the prosecution also called numerous friends and relatives of Green, including Green's parents, his brother, and the third-party custodians who supervised Green during his pretrial release. The state questioned these witnesses at length concerning any explanation Green might have offered for his daughter's death or for the various injuries the child had suffered before the day she died. Almost without exception, these witnesses testified that Green had failed to explain anything about his daughter's death or the child's prior injuries.[1]

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. For example, Green's mother testified, in relevant part, as follows:

    Q: Did he [Kevin Green] tell you what he and Brittany had done throughout the course of the day?
    A: No, I didn't ask him. He didn't tell me.
    Q: Did he report to you any kind of accidental injuries to the baby during the day she died?
    A: No, none that I can recall.
    Q: And are these statements you just relayed to us all that your son's ever said about the last day of your granddaughter's life?
    A: Uh-hum, pretty much.

Green subsequently moved to dismiss his indictment, arguing, among other things, that the evidence as to cause of death was too inconclusive to support a murder charge and that the state had relied on inadmissible evidence of his silence to obtain the indictment. Judge Johnstone granted Green's motion to dismiss, relying on both the insufficiency of the evidence as a whole and the impropriety of the testimony relating to Green's failure to make exculpatory statements.[2]

The state appeals, challenging the propriety of Judge Johnstone's ruling. With respect to the use of Green's silence as evidence of guilt, both parties devote considerable attention to the issue of whether the disputed evidence was constitutionally prohibited. *See, e.g., Doyle v. Ohio*, 426 U.S. 610, 616–20, 96 S.Ct. 2240, 2243–46, 49 L.Ed.2d 91 (1976); *Silvernail v. State*, 777 P.2d 1169, 1174–75 (Alaska App.1989). However, we find it unnecessary to decide the constitutional issue, since the admissibility of the challenged evidence can be determined as an ordinary evidentiary matter.

With certain limited exceptions not pertinent here, only "[e]vidence which would be

----

Q: Okay. You said he didn't tell you anything about that [injuries] in the first week after the baby's death. Has he ever explained to you how your granddaughter got a cigarette lighter burn on the bottom of her foot?
A: I've never had any reason to have Kevin explain that to me.
Q: Well, he's been charged with—
A: Just because you've been charged does not mean that you're guilty, and I don't like the way you just said that.
Q: That's true, Mrs. Green, but I'm just saying that because he's been charged—you've been assisting in his defense in this case, right?
A: I don't know what you mean by that? What do you mean?
Q: Well, hiring him a defense attorney and making arrangements for that, right?
A: Well, certainly, yeah. Yeah, his dad and I are covering those expenses.
Q: So, it's not exactly true that there wouldn't be a reason for you to question your son about this case?
A: I didn't—no, you're mistaken. You question people when you doubt them, and you question people when you think you have a reason to be suspicion—suspicious, and I don't have any reason to be suspicion. I know Kevin.
Q: Has Kevin ever told you how the baby got a cigarette lighter burn on her foot?
A: Nope and I've never asked him how.
Q: Has Kevin ever told you how the baby got three broken ribs?
A: No. As I tell you, Kevin didn't know until he was told.
Q: Has Kevin ever told you how the baby got brain injuries or head injuries?
A: I have never heard that Brittany had brain injury.

. . . .

Q: Did your son ever tell you how your granddaughter got head injuries?
A: No. . . .
Q: But, Mrs. Green, what I'm asking is has your son ever told you how your granddaughter got head injuries?

A: No. My answer remains consistent. I've never had any reason to question Kevin. Kevin has never had any reason to feel that he needed to explain or justify. You don't have to do that when you're not at fault.
Q: Has he ever told you the story that he accidently burned the baby's foot with a cigarette lighter by dropping a lighter on her foot while holding her?
A: No, he's never told me the story.
Q: Did he tell you that statement?
A: Nope.
Q: So, you're saying then in the fifteen months since your granddaughter died you have had no conversations with your son on the subject of your granddaughter's injuries except you initially asked him about them and he said he didn't know anything about that? Other than that, no other conversations?

2. In relevant part, Judge Johnstone stated:

The feeling I'm left with is that the prosecutrix, number one, infringed on the defendant's constitutional right to remain silent by asking such questions; and that her motivations and reasons given certainly don't rise to a level justifying invading the defendant's constitutional rights. Further, there's a subtle change in the burden of proof by such an inquiry, placing the burden on the defendant to come forward to explain away his conduct before the grand jury, when it's the state's burden to establish probable cause before the grand jury. . . . However, if some reviewing court were to find that the presentation to the second grand jury was adequate, was sufficient, my determination of dismissing on the grounds of presenting inadmissible evidence by the prosecutrix is founded on the theory that the state's case was very weak, and that it took very little error to swing the jury, or to inflame the jury or unfairly prejudice the jury, and the state's burden of showing harmless error beyond a reasonable doubt has not been even close to established.

legally admissible at trial shall be admissible before the grand jury." Alaska R.Crim.P. 6(r)(1). In this case, the state advances two theories to support the admissibility of the extensive grand jury testimony concerning Green's failure to make exculpatory statements.

■ First, relying on its general obligation to present exculpatory evidence to the grand jury,[3] the state attempts to characterize the testimony as a *bona fide* search for potentially exculpatory statements. The ingenuousness of this argument verges on the disingenuous. The obvious focus of the state's protracted questioning of numerous witnesses before the grand jury was not on what Green had said to his friends and relatives but rather on what he had not said. In summarizing the evidence to the grand jury, the prosecution emphasized Green's failure to make exculpatory statements. The prosecutor who presented the case to the grand jury also expressly acknowledged to the trial court that she had relied on the challenged testimony as evidence of an admission by silence. The nature and extent of inquiry into Green's silence go far beyond anything that could conceivably be justified as a *bona fide* search for potentially exculpatory statements.

■ Second, the state attempts to characterize the challenged testimony as falling within the hearsay exception for adoptive admissions, or admissions by silence. *See Doisher v. State*, 658 P.2d 119, 120–21 (Alaska 1983); *Blue v. State*, 558 P.2d 636,

645 (Alaska 1977); *Watson v. State*, 387 P.2d 289, 291 (Alaska 1963). The adoptive admission theory, however, is plainly inapplicable here.

■ One of the basic foundational requirements of the adoptive admissions theory is a specific showing of a statement or circumstances calling for a reply. *Doisher*, 658 P.2d at 120. In other words, before seeking to use the challenged evidence in this case as an admission by silence, the state had the burden of showing that Green's failure to make an exculpatory statement occurred in response to something "to which an innocent man would in the situation and surrounding circumstances naturally respond...." *Id.* at 121.

No such showing was made or even attempted here. Instead, the disputed testimony appears to have been offered on the mere assumption that an innocent person should feel morally bound to make exculpatory statements to friends and relatives at some point after the unexplained death of a child. Such a broad, generalized and unsupported assumption as to what an innocent person should do at some unspecified time during a fifteen-month period hardly meets the specific evidentiary prerequisites for admission under the adoptive admissions theory.[4]

The state hedges on the issue of admissibility by arguing that the disputed evidence was at worst arguably inadmissible. According to the state, the admissibility of the evidence at trial would ultimately have turned on a balancing of probative value

---

3. *See, e.g.,* Alaska R.Crim.P. 6(q); *Frink v. State,* 597 P.2d 154, 164–65 (Alaska 1979).

4. In an effort to bolster its argument on this theory, the state contends that "[t]here was evidence that if Green was upset with something he would ordinarily discuss the matter with his parents." The record, however, fails to support the conclusion that an exculpatory statement by Green would have been natural under the circumstances. The portion of the state's argument cited above is apparently a reference to the following testimony by Green's brother:

> Q: If Kevin [Green] was going to confide in somebody about some personal matter, who would you expect that he would talk to?
> A: Probably confide in the family.
> Q: Who in the family?

> A: Well, any of us, either my mom or my dad.
> Q: Have you ever heard Kevin talking to either of your parents about the death of the baby?
> A: No, I haven't.
> Q: Have you ever heard him talking to either of your parents about the baby's injuries?
> A: No, I haven't.

Nowhere in this passage does Green's brother purport to say that it would have been natural for Green to discuss his daughter's death with his parents if he had been innocent. At most, Green's brother acknowledged hypothetically that, assuming "Green was going to confide in somebody in some personal matter," it would likely have been his parents.

against prejudicial impact. *See* A.R.E. 403(b). The state contends that, because no judge presides over grand jury testimony to make such balancing decisions, the evidence was properly presented to the grand jury, even if it might have been inadmissible under A.R.E. 403(b). *See, e.g., Coleman v. State,* 553 P.2d 40, 48 (Alaska 1976); *State v. Parks,* 437 P.2d 642, 644–45 (Alaska 1968).

■ The state is mistaken. The challenged evidence would have been arguably admissible only if the state had met its burden of establishing the foundational prerequisites for application of the adoptive admissions theory; unless and until those prerequisites were met, there would be no occasion to undertake the balancing of probative value against prejudicial impact under Evidence Rule 403(b). *See Doisher,* 658 P.2d at 121 n. 10.

■ In short, the state has failed to establish that the disputed evidence would have been "legally admissible at trial." Alaska R.Crim.P. 6(r)(1). Even so, the use of this inadmissible evidence before the grand jury would justify dismissal of Green's indictment only if the remaining, properly presented evidence was insufficient to support the return of an indictment or if the inadmissible evidence appreciably affected the outcome of the grand jury's deliberations. *See Oxereok v. State,* 611 P.2d 913, 916 (Alaska 1980); *Metler v. State,* 581 P.2d 669, 674 (Alaska 1978); *Panther v. State,* 780 P.2d 386, 393 (Alaska App.1989).

■ In the present case, given the inconclusive evidence as to the cause of Green's daughter's death, the evidence that was properly admitted against Green was not strong. Even assuming that this evidence was sufficient to support Green's indictment, the state's extraordinary emphasis on Green's failure to make exculpatory statements unquestionably had a profound effect on the grand jury's deliberations. In ordering dismissal, Judge Johnstone expressly recognized both the relative weakness of the state's evidence and the comparative strength of the prejudice arising from the inadmissible evidence. Because the record strongly supports a finding that the inadmissible evidence appreciably affected the grand jury's deliberations, Judge Johnstone did not abuse his discretion in ordering dismissal of Green's indictment.

The order of dismissal is AFFIRMED.