John Ian Arthur BRIGHT, Appellant,

v.

STATE of Alaska, Appellee.

No. A–2292.

Court of Appeals of Alaska.

Jan. 24, 1992.

As Corrected May 21, 1992.

---

William B. Carey, Anchorage, for appellant.

W.H. Hawley, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS,* Superior Court Judge.

## OPINION

COATS, Judge.

John Ian Arthur Bright was convicted, following a jury trial, of murder in the first degree, an unclassified felony with a maximum sentence of ninety-nine years of imprisonment. AS 11.41.100(a)(1). Superior Court Judge Mary E. Greene sentenced Bright to the maximum ninety-nine-year sentence and ordered that Bright's eligibility for parole be restricted until he had served forty years of imprisonment. Bright appeals, raising several issues. We affirm.

On October 12, 1985, on his way home from work, Robert Pfeil stopped his automobile at the intersection of Jewel Lake Road and North Point Drive in Anchorage. Neighborhood residents reported that a large sedan pulled up alongside Pfeil; the driver fired multiple shots into Pfeil's vehicle before speeding away. On November 11, 1985, Pfeil died from the wounds suffered during the shooting.

Anchorage police investigated the crime scene and the nearby Pfeil property. Investigators found that a window in the Pfeil garage had been broken, and followed distinctive footprints near the garage. These footprints were also discovered in a nearby wooded area. Casts of the prints were subsequently identified by F.B.I. experts as "matching" boots police later seized and linked to Bright. Among the trees, pieces of plywood were discovered; police speculated that the Pfeil residence had been surveilled from this spot.

Approximately one week after the shooting, investigators learned that a Tyoga Closson had been talking about details of the Pfeil shooting. Closson eventually made a statement to the police that he had provided a stolen handgun, which was used in the shooting, to Joseph K. for $75. Closson also told investigators that he had been approached by Bright, who had asked him to drive a car while Bright shot someone. Although Closson stated that he declined the invitation, Closson implicated K. as the driver.

Closson agreed to cooperate with police. District Court Judge David C. Stewart issued a warrant authorizing the electronic surveillance of conversations between Closson and several individuals, including K. and Bright.

Closson, following law enforcement instructions, told K. that the police had recovered the gun and linked it to both Closson and the shooting. The purpose of this scenario was to get K. to talk about his involvement and "if possible, to scare [K.] bad enough ... that he would feel that his only hope was to come to the police." Subsequently, K. did go to the police and make a statement. K. stated that Bright had been hired to rough-up Pfeil over a union dispute. K. admitted he had agreed to be and was the driver of the car when Bright opened fire on Pfeil. K. also confirmed police theories regarding the surveillance of the Pfeil residence, and the rock through the garage window. K. reported that during the surveillance, Bright wore military boots similar to a pair the police suspected had made the footprints found around the Pfeil property.

K. agreed to conduct surreptitiously monitored conversations and otherwise cooperate with the police. Because Bright had left the state, the police turned the focus of the investigation to Larry Gentry,

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

the owner of the Lincoln driven by K. on the evening of the shooting. Police helped K. write a letter implicating Gentry and detailing the Pfeil shooting.

Janet Perkins, an Anchorage police officer and Gentry's sister, accompanied Gentry to pick up the letter. Officer Perkins took Gentry to the police station, where he was interviewed by investigators. Gentry, while denying knowledge of the shooting, made several contradictory and incriminating statements. He acknowledged that Bright had been living at his trailer home and had been using his Lincoln.

Gentry agreed to allow police to come to his trailer home to photograph a shotgun that was mentioned by the letter as being involved in the Pfeil shooting. Gentry told police they could "come over there and go through my house ... do anything [they] want." Once on the premises, police asked if Bright had left anything behind before leaving the state. According to police, Susan Gentry stated that clothing was left behind, and took them to a room Bright had been using. Police spotted a pair of military jungle boots that they expected would match the footprints from the Pfeil property. Investigators claim the Gentrys gave permission to take Bright's belongings. There is conflicting testimony whether Bright was welcome back and whether the Gentrys consented to a search and the subsequent warrantless seizure of Bright's clothing and boots.

Gentry gave a lengthy statement to police, and agreed to allow electronic equipment to be installed on his phone to record conversations with Bright. According to Gentry, he and Bright had been recruited by Gilbert "Junior" Pauole to kill Pfeil.

Bright returned to the state on November 7. On November 8, Gentry, while being electronically surveilled by police, told Bright he was going to surrender to police. That evening, Pauole and Bright were arrested. Pauole told investigators that he had arranged the killing on behalf of the victim's former brother-in-law, Neil S. MacKay.[1]

At trial, the state's theory of the case was that the killing of Pfeil was the result of a longstanding adverse relationship between Pfeil and MacKay. Pfeil's sister, Muriel, had married MacKay in the 1960's. Pfeil believed that MacKay was responsible for the car bomb that had killed Muriel. The two men had been bitterly engaged in custody disputes and other litigation concerning Scotty, the child of Muriel and Neil MacKay.

Pauole testified that MacKay promised to pay $10,000 and apparently provide Pauole assistance in opening a new nightclub as consideration for having Pfeil killed. Pauole stated that he selected Bright and Larry Gentry, individuals who had worked for him at his nightclub and as part of a cocaine distribution operation, to carry out the contract for $10,000 minus a cocaine debt the men owed Pauole. This is supported by a recorded conversation between Bright and Gentry.

Matthew Vickers testified that Bright borrowed dark clothing and "jungle boots" in order to do "some kind of surveillance." Vickers also testified that, in early October, Bright had left him C–4 explosives to safeguard; Bright later told Vickers that the material was to make an explosive device as "backup" for a job he had taken. After the shooting, Bright told Vickers that he had performed a contract hit, killing Pfeil for Pauole.

Pauole testified that Bright had reported conducting surveillance of the Pfeil home from nearby woods and had considered shooting Pfeil from a clandestine wooded position. Pauole also recounted Bright planning to throw a Molotov cocktail or a rock through a window and shoot Pfeil as he left the house. The state presented evidence tending to corroborate the surveillance story.

Pauole also stated that he advised Bright and Gentry regarding choice of weapons. The state presented evidence through several witnesses tending to connect Bright with the murder weapon.

1. MacKay was charged, tried, and acquitted on charges that he arranged for the murder.

Bright's girlfriend, Theresa Marshall, testified that while motoring with Bright, Bright had pointed out a jogger and stated that he had been hired to murder that person. Pfeil's wife testified that a man she identified as Bright had come to her home a few weeks before the shooting looking for her husband.

Pauole testified that after the shooting of Pfeil, Bright came to him for payment. Pauole refused to pay because Pfeil was still alive. According to Pauole, Bright responded, "[no] way, I shot him five times, he shouldn't be alive." The next day, according to Pauole, Bright said he had shot Pfeil with a .45 caliber handgun, expressed concern that Pfeil had seen his face, and made plans to blow up the hospital where Pfeil had been taken. Pauole took Bright to the airport and sent him to Texas.

Marshall visited Bright in Texas, bringing him a package from Gentry containing approximately $2500. Pauole testified that he had provided the money to Gentry. Marshall testified that Bright confessed to having hired a driver, pulled up alongside Pfeil in a yellow Lincoln, and shot Pfeil five times with a .45 caliber handgun. Marshall stated that Bright claimed to have shot Pfeil in exchange for $7500 from Junior Pauole on behalf of a man in Hawaii.

Upon returning to Alaska and searching for K., Bright made incriminating statements which were testified to by Melody Markley (K.'s girlfriend) and Randy Moore (a friend of K.'s). The recorded conversations between Gentry and Bright were admitted into evidence, and implicated Bright in the murder.

Based on this evidence, Bright was convicted by a jury of first-degree murder.

## INDICTMENT ISSUES

Bright raised several issues concerning evidence that the state presented at the grand jury proceeding. Bright argues that Judge Greene erred in not dismissing the indictment because of the introduction of this evidence.[2]

■ In reviewing these contentions, Judge Greene found that the state had admitted some evidence that would be inadmissible at trial in violation of Alaska Rule of Criminal Procedure 6(r)(1). However, Judge Greene found that "the admissible evidence presented to the grand jury made a very strong case against Mr. Bright if unexplained or uncontradicted." When the state introduces inadmissible evidence at grand jury in violation of Rule 6(r), the trial court is to dismiss the indictment "only if the remaining, properly presented evidence was insufficient to support the return of an indictment or if the inadmissible evidence appreciably affected the outcome of the grand jury's deliberations." *State v. Green*, 810 P.2d 1023, 1027 (Alaska App. 1991); *see also Oxereok v. State*, 611 P.2d 913, 916 (Alaska 1980). We agree with Judge Greene that the admissible evidence that the state presented at grand jury made a strong case against Bright. We conclude that Judge Greene did not err in refusing to dismiss the indictment.

## TRIAL ISSUES

■ Judge Greene issued a protective order forbidding the state to bring up instances of other shootings by Bright. The assistant district attorney who tried this case was aware of the order and explained the order to his witnesses.

During the trial, state witness Brenda Pate testified that she was friendly with

---

**2.** Bright contends the following evidence was inadmissible:
   1. A police officer stated that Bright was a dangerous individual, who, police believed, had returned to Alaska to kill his codefendant;
   2. Bright's father testified that Bright had criminal fantasies, fancied himself a bigtime hoodlum, claimed responsibility for other crimes, and needed psychological help;
   3. A state witness testified that Bright, in a prior incident, had been charged with assault

for beating a man with a pickaxe handle outside the strip bar where Bright worked;
   4. The Lincoln Continental, putatively used during the shooting and said to have been driven by Bright, was referred to as a "cop killer"; and
   5. Hearsay statements of Bright's codefendants were introduced without a showing of compelling circumstances.

Bright and had sold cocaine for him. She had apparently met Bright while selling drugs for one of Bright's friends, and testified that when she first met Bright he had advertised himself as a hit-man who would take care of her needs for a small price. Pate also stated that she had seen Bright and Betts loading firearms into a light-colored Lincoln in June or July. Bright's counsel asked her why she had not told the police these things when she was first interviewed. On redirect, the following exchange took place:

> Q: So now tell us why you wanted to talk to the police when you knew you'd have to be telling them about doing an illegal activity yourself. Why did you come forward?
> A: Explain that again, please.
> Q: Well, why did you come forward to the police and give them the information you had?
> A: *Because he was shooting at my house and stuff.*
> Q: Now, the—did you have any other reason, any other motive in doing that?
> A: No.

(Emphasis added).

Bright moved for a mistrial the next day. Bright claimed that no cautionary instruction could be curative.

Judge Greene denied the motion for a mistrial. She found that Pate's statement was but a "brief comment" and ordered the parties not to make any further reference to the comment. Judge Greene gave a general cautionary instruction at the close of the trial that directed the jury not to be prejudiced by allegations that a defendant had engaged in prior bad acts for which he was not charged. We conclude that Judge Greene did not abuse her discretion in refusing to grant a mistrial. We believe that

Judge Greene could properly find that the jury would not be unduly prejudiced by Pate's statement and that any possible prejudice to Bright would be cured by the court's instruction. We find no error.

Joseph K., after his arrest, told his girlfriend, Markley, that he had been the person who had shot Pfeil. Closson, similarly, told his girlfriend, Joanne Harris, that "him and his friend went and blew this guy [Pfeil] away." Bright attempted to introduce these statements under an exception to the hearsay rule provided by Alaska Evidence Rule 804(b)(3).[3] Judge Greene analyzed the statements and found they were not sufficiently trustworthy under A.R.E. 804(b)(3).

■ Rule 804(b)(3) provides that a statement inculpatory to the declarant and exculpatory to the accused is only admissible if "(1) the declarant [is] unavailable; (2) the statement [is] against the declarant's penal interest; and (3) there [are] corroborating circumstances that clearly indicate the trustworthiness of the statement." *United States v. Gossett*, 877 F.2d 901, 906 (11th Cir.1989) (analyzing F.R.E. 804(b)(3)), *cert. denied*, 493 U.S. 1082, 110 S.Ct. 1141, 107 L.Ed.2d 1045 (1990).

■ Markley testified at an evidentiary hearing that after K. was arrested, and while Markley was carrying K.'s child, K. had told her that he had been the "shooter" in the Pfeil murder, but that nobody could prove it. K. also stated, Markley reported, that Bright had been wearing gloves at the time. However, Markley stated that K. would change his story, sometimes saying he was the shooter, or merely the driver, or not involved at all; Bright was always present in K.'s versions of the shooting. On cross-examination, Markley stated that she did not remember the "shooter" state-

---

**3.** A.R.E. 804(b)(3) provides:

(b) **Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) *Statement Against Interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render

invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*
(Emphasis added.)

ment until after she had testified at trial. Markley "vaguely" remembered K.'s making the statement while drunk at a pool hall, but also stated the only time he made the statement was during a post-arrest telephonic conversation in which Markley was "busy watching television." K., according to Markley, also had been telling Markley that he was going to be granted immunity and given witness protection. The "shooter" statement was in response to Markley's inquiry into "what was going on and who did what." Markley felt that "he was bragging 'cause he was getting a lot of attention ... [f]rom the guards and the courtroom and everybody." Markley stated that she was confused by all the versions and chose to believe that Betts was the driver because she did not believe that K. could shoot somebody.[4]

Judge Greene found that the "shooter" statement lacked A.R.E. 804(b)(3)'s requisite level of trustworthiness: "Given the vagueness of the statement, given the internal inconsistencies with respect to who was wearing gloves, whether Miss Markley was in fact paying very close attention, her reactions as well as all the external matters that I talked about before, I don't think that the trustworthiness is there."

Closson told his girlfriend, Harris, that "they were going to be paid to hurt this guy ... him and his friend went and blew this guy away." Closson made this statement to Harris while she and Closson were both under the influence of a controlled substance, having smoked "a lot" of marijuana. While Harris believed that Closson was relatively in control of his faculties, she had only a vague recollection of the conversation. Harris was "[s]hocked and amazed," but mostly that "he would try to make somebody believe that he did something like that."

Harris and Closson were having a discussion concerning money Closson owed Harris because he had wrecked her car. Closson then implicated himself in the murder and suggested that she could call "Crimestoppers" and turn him in to collect the $1000 reward. Harris stated that she did not believe the statement because Closson frequently told stories and bragged about "tough guy" exploits.

Closson also, at times, told Harris that he had driven the car, and that a person named John had shot Pfeil. Harris also took this as prevarication and bravado. Closson, after he had started cooperating with police, told Harris he had merely stolen the gun that was used, and lent it to someone. Harris stated she believed this story because Harris provided a more detailed narrative, and because "[a]fter he started working with [the police] he was more sober because he was trying to watch himself better."

Judge Greene found that the circumstances surrounding the "blew ... away" statement did not indicate that the statement was trustworthy. She also concluded that Closson's statement was inconsistent with the evidence in the case.

We conclude that Judge Greene did not abuse her discretion in rejecting admission of the statements of codefendants Closson and K. Alaska Rule of Evidence 804(b)(3) provides that such statements are "not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement[s]." *See Garroutte v. State,* 683 P.2d 262, 265–67 (Alaska App. 1984). We find no error.

■ In a related argument, Bright argues that the exclusion of K.'s and Closson's statements violated his constitutional right to due process of law. He relies on *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). We rejected a similar claim in *Garroutte:*

> The standards of admissibility prescribed by Evidence Rule 804(b)(3) parallel the constitutional mandate of *Chambers.* Our holding that [the exculpatory hearsay statement] was not clearly corrobo-

---

**4.** However, she was aware of two incidents in which K. had pulled a gun or shot at people in the past.

rated therefore controls Garroutte's constitutional claim.

683 P.2d at 267 (citing *United States v. MacDonald*, 688 F.2d 224, 232 n. 13 (4th Cir.1982), *cert. denied*, 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983)).

Similarly, our conclusion that Judge Greene did not err in finding that K.'s and Closson's statements were not sufficiently trustworthy to admit into evidence compels the conclusion that her failure to admit these statements into evidence did not violate Bright's right to due process of law.

■ Bright contends that the warrantless seizure of his boots and clothing from the Gentry home was illegal because it did not fall into an exception to the warrant requirement. Specifically, Bright argues that he had not abandoned the property seized, that the Gentrys did not have authority to consent to the seizure, and that the putative consent given by the Gentrys was involuntary.

After giving a statement to police, Gentry agreed to allow police to come to his trailer home to photograph a shotgun that was mentioned as being involved in the Pfeil shooting by K.'s letter and to generally "go through my house." Having learned that Bright had been living with Gentry, police became interested, before arrival, in finding out whether he had left anything in the residence, particularly clothing or a certain pair of boots. Gentry was taken to his trailer home by his sister, an Anchorage police officer. Once on the premises, investigators asked Gentry and his wife, Susan, whether Bright had left anything behind before leaving the state. According to police, Susan Gentry stated that clothing was left behind, and took them to a "storage area" that Bright had been using. Police spotted a pair of military jungle boots that they expected would match the footprints from the Pfeil property. Investigators claim the Gentrys gave permission to take Bright's belongings. There is conflicting testimony whether Bright was welcome back and whether the Gentrys consented to a search and the subsequent warrantless seizure of Bright's clothing and boots.

Judge Greene, after an evidentiary hearing, found that although Bright had lived in the Gentry home, he was asked to move out near the end of September 1985, and was, thereafter, primarily living elsewhere. Judge Greene found that Bright left the state on October 15, 1986, taking most of his possessions, and left the Gentrys a note stating that he would return in two weeks. Bright left clothing in what Judge Greene found to be a room "subject to the joint control and access of the Gentry's [sic] and himself." Judge Greene found that Bright was not wanted back by the Gentrys. Judge Greene concluded: (1) Bright did not abandon his boots and clothing and did not intentionally relinquish his reasonable expectation of privacy in his belongings; (2) the Gentrys had actual and apparent authority to consent to the search and seizure of Bright's property stored in the storage area of the Gentry trailer home; (3) the police entry into the Gentry home and the storage area was lawful; (4) seizure of the boots, but not the clothing, was lawful under the plain view doctrine; and (5) the Gentrys validly consented to the seizure of the boots and clothing.

The record clearly establishes that the storage area that contained Bright's personal effects was a place where the Gentrys had access and control. In *Ingram v. State*, 703 P.2d 415, 425 (Alaska App.1985), *aff'd*, 719 P.2d 265 (Alaska 1986), we stated: "[T]he extent of a host's authority to consent to a search of personal effects belonging to a guest must be determined by a realistic assessment of the degree of privacy the guest might reasonably expect to receive from his host." Similarly, "a person with 'joint access to, or control of' a place is authorized to consent to entry" by the police to search. *Phillips v. State*, 625 P.2d 816, 818 n. 5 (Alaska 1980) (quoting *Robinson v. State*, 578 P.2d 141, 144–45 (Alaska 1978)). There was sufficient evidence for Judge Greene to conclude that the Gentrys gave actual consent to the police to search the storage area and to seize the boots and clothing. There was sufficient evidence for Judge Greene to

conclude that the Gentrys' consent was voluntary. *See Sleziak v. State*, 454 P.2d 252, 257 (Alaska 1969), *cert. denied,* 396 U.S. 921, 90 S.Ct. 252, 24 L.Ed.2d 202 (1969). We conclude that Judge Greene did not err in denying Bright's motion to suppress.

■ Bright next argues that Judge Greene erred in failing to suppress the entirety of a confession that he made to the police. Bright contends that Judge Greene's rulings affected his right to due process and affected his ability to intelligently decide whether to testify on his own behalf. A certain amount of factual background is necessary for us to discuss this issue.

Bright, having been arrested and appointed counsel, telephoned police requesting to make a voluntary statement. Police did not contact the Public Defender Agency before going to the jail and conducting a lengthy interview of Bright. Bright told investigators that he wished to talk about Pauole. By page three of the transcript it became apparent that Bright was making possibly incriminating statements. Police stopped Bright, read him his *Miranda* rights, and explained that he had an attorney. Bright stated that he had been advised against giving a statement but was choosing to do so in order to incriminate others he claimed were also involved, even if he incriminated himself in the process.

Of the four- to five-hour statement, approximately one hour's worth of tape was erased or destroyed. Police explained the loss by suggesting that one of the tapes was probably mistakenly used a second time and recorded over. Bright moved to suppress the statement in its entirety, arguing bad faith, negligence, and prejudice (use of tape "may have a real impact on [Bright's] decision" whether to testify). The section of the statement preceding *Miranda* warnings had already been suppressed by Judge Greene.

Judge Greene, after hearing testimony and arguments of counsel, concluded that there was no way to determine the content of the missing tape; therefore, prejudice should be assumed and a sanction was warranted. Judge Greene ruled:

In determining what sanction if any—if—what sanction is appropriate, the court has considered the level of culpability which I consider to be quite low, the fact that a great deal of information is present on the tape that was recorded, the fact that it's unlikely that there was significant prejudice to the defendant, although given the fact we don't know what's there, I think I must still presume some, and the fact that I believe that the state has met its burden of proving that the officers were acting in good faith, the sanction which I choose to impose is the following. First, that the state may not introduce the statement in its case in chief which is not a very much [sic] of a sanction given the fact that they didn't intend to. Further, that I'll—I will limit impeachment of Mr. Bright to what is actually contained on the tape. If Mr. Bright testifies that he said something different while during—during the unrecorded portion, the state may not impeach Mr. Bright with any sort of rebuttal testimony or officer rebuttal testimony regarding what went on during the unrecorded portion.

In *Stephan v. State,* 711 P.2d 1156 (Alaska 1985), the supreme court required the police to record custodial interrogations that were conducted in a place of detention. The supreme court stated:

[C]ustodial interrogations in a place of detention, including the giving of the accused's *Miranda* rights, must be electronically recorded. To satisfy this due process requirement, the recording must clearly indicate that it recounts the entire interview ... so that courts are not left to speculate about what took place.

711 P.2d at 1162. However, *Stephan* provides for exceptions to the general rule of exclusion:

[F]ailure to record part of an interrogation does not bar the introduction of a defendant's recorded statements, *if the unrecorded portion of the interrogation is, by all accounts, innocuous.* In such cases, there is no reason to exclude the defendant's recorded statements, because no claim of material misconduct

will be presented. *See* Rule 47(a), Alaska R.Crim.P. (errors which do not affect substantial rights shall be disregarded). For the same reason, a defendant's unrecorded statement may be admitted if no testimony is presented that the statement is inaccurate or was obtained improperly, apart from violation of the [recording requirement].

711 P.2d at 1165 (emphasis in original).

Bright has not claimed any specific prejudice that resulted from the police failure to preserve the recording of a part of his statement. We believe that the remedies that Judge Greene applied in this case were adequate. We find no error.

Bright next contends that Judge Greene erred in failing to suppress tape recordings that the police made of conversations between Bright and codefendant Gentry. Bright contends that the police secured Gentry's cooperation in making the recorded statements "in gross violation of [Gentry's] right to counsel and his right against self-incrimination." Bright argues that he has standing to raise the alleged police violation of Gentry's rights under *Waring v. State*, 670 P.2d 357 (Alaska 1983). Judge Greene, who had presided over Gentry's trial, noted that she had previously found that the police had not violated Gentry's rights, and ruled that Bright had not shown that he met the derivative standing requirements of *Waring*.

On appeal, Bright has expanded the arguments that he made in the trial court. Bright contends that even though Gentry was not in custody at the time he made statements to the police on October 29 and November 2, 1985, and during his testimony in support of search warrants, Gentry was the target of an investigation, and the police were required to specifically warn him that his statements and cooperation with the police could be used against him. Bright urges this court to extend the requirement of *Pinkerton v. State*, 784 P.2d 671, 675–76 (Alaska App.1989) (state required to give target warnings to potential defendant appearing before grand jury). Bright urges us to require the police to warn defendants who are targets of investigation before speaking with them or bringing them before a magistrate in a search warrant proceeding.

In order to have standing to raise a police violation of Gentry's rights under *Waring*, Bright must show either "police misconduct which shocks the conscience, or is of a nature that calls for the judiciary, as a matter of judicial integrity, to disassociate itself from benefits derivable therefrom" or that police intentionally violated Gentry's rights in order to obtain evidence against Bright. *Giel v. State*, 681 P.2d 1364, 1367 n. 3 (Alaska App.1984). We conclude that Judge Greene did not err in concluding that Bright had not shown such a violation of Gentry's rights as to allow Bright standing to assert the violation under *Waring*.

Bright next contends that Judge Greene erred in allowing the state to show a videotape that demonstrated an explosive called C–4.

The state presented testimony by Vickers that Bright asked him to store an explosive called C–4, telling Vickers that it was a backup for a job Bright had taken. Vickers testified that Bright discussed how the C–4 could be used to make an explosive device. The state sought to show the jury a videotape of an automobile being exploded with a pound of C–4; the defense objected on the grounds of relevance and prejudice. Judge Greene found the tape admissible and found no danger of prejudice.

Bright argues that the tape was inadmissible under A.R.E. 402 and 403. The state counters that because Bright failed to include the tape in the record of appeal, he cannot show that error occurred. *See Yarbor v. State*, 546 P.2d 564, 568 (Alaska 1976) (appellant who failed to certify relevant evidence into record could not establish prejudice). However, at trial the prosecution stated that the videotape was "something less than a minute and simply shows—it's a training film and it simply shows one pound of C–4 blowing up a standard automobile with no one in it."

We do not find that Judge Greene abused her discretion in admitting this evi-

dence. The videotape appears to have merely demonstrated the nature of the explosive. It was clear that the state was not accusing Bright of blowing up any car. Judge Greene could properly conclude that the evidence was not unduly prejudicial.

Bright next contends that Judge Greene erred in not dismissing a juror who, during the trial, saw Bright in the back of a trooper vehicle. The juror also saw Bright in shackles, being led into a room at the courthouse.

Upon being questioned about this incident, the juror stated that he assumed it was normal to keep defendants charged with serious crimes in custody. He assured Judge Greene that he would not discuss what he had seen with the other jurors and would not let what he had seen affect his judgment.

Given the juror's assurances, we conclude that Judge Greene did not abuse her discretion in refusing to discharge the juror. *Cf. Contreras v. State*, 767 P.2d 1169, 1172–73 (Alaska App.1989) (not abuse of discretion to deny mistrial when juror saw defendant shackled and concluded it was due to past criminality, but accepted explanation that it was due to inability to make bail and agreed not to be prejudiced); *Hines v. State*, 703 P.2d 1175, 1176–78 (Alaska App.1985) (not abuse of discretion to deny mistrial when trooper followed defendant out of court in front of jury).

Bright lastly contends that the cumulative effect of all the errors he has alleged requires reversal. *See Pletnikoff v. State*, 719 P.2d 1039, 1045 (Alaska App.1986). We do not believe that Bright is entitled to a new trial based upon the cumulative effect of the errors that he has alleged.

The conviction is AFFIRMED.